FILED_____ ENTERED
LODGED_____ RECEIVED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FEB 4 2021

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____ DEPUTY

MAYNARD SNEAD,

    Petitioner,

v.

                          Civil Action No.: RDB-19-1183

WARDEN,

    Respondent.

## MEMORANDUM OPINION

In response to this Petition for Writ of Habeas Corpus, Respondent asserts that the petition should be dismissed as untimely. ECF 9. Petitioner Maynard Snead seeks equitable tolling of the one-year filing deadline because he is blind; he also asserts he is actually innocent and asks the Court to review the admittedly untimely claims. ECF 13. No hearing is necessary for the determination of the pending issues. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2018); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the reasons that follow the petition shall be dismissed as untimely and a certificate of appealability shall not issue.[1]

### Background

**I.    Evidence Produced at Trial**

Maynard Snead was convicted and sentenced to a 35-year prison sentence on charges of first-degree assault, reckless endangerment, and related gun offenses in connection with firing a

---

[1]    While the petition has been pending before this Court, Snead was released on parole. *See* ECF 16 at 3. As Snead is obligated to remain on parole until the maximum expiration date of his sentence, October 7, 2042, his petition has not been made moot by his release. *See Maleng v. Cook*, 490 U.S. 488, 491(1989) ("in custody" does not require physical confinement for purposes of challenging a sentence on habeas corpus).

handgun into a crowd of people on December 22, 1998 on East Fayette Street in Baltimore, Maryland. He injured three people and, ostensibly, engaged in this behavior because a friend dared him to do so.

On the day of the shooting, Baltimore City Police Officer Alvin McCoy received a report of gunshots and responded to the 2400 block of East Fayette Street, but found nothing unusual. ECF 9-4 at 43-44.[2]  A second call reported two gunshot victims in the 2500 block of East Fairmount where Officer McCoy found medical personnel attending to Timothy Thornton who had sustained gunshot wounds to his stomach, thigh, and ear. *Id.* at 44-45. Additionally, Donnell Smith was being treated for a gunshot wound to his foot. *Id.* When McCoy questioned Smith, McCoy found him to be uncooperative, giving only a vague description of the shooting. *Id.* at 47-48. Smith told McCoy that two or three men had approached him and Thornton and that one of the men shot them. *Id.* McCoy returned to the scene of the shooting and found cartridge casings near a bus stop. *Id.* at 49-50; 58; 71-72. Snead was arrested in October of 1999. ECF 9-2 at 3.

A second police officer, Kevin Watford, responded to 148 N. Milton Street where Latasha Davis reported being shot in her arm and foot while in the 2400 block of East Fayette Street. ECF 9-4 at 82-84. Ms. Davis had not seen the shooter and was unable to identify anyone from a photographic array. *Id.* at 91. Because Ms. Davis was having difficulty with her pregnancy, she did not testify at trial. *Id.* at 111; 117. The State had Ms. Davis's mother, Angela Hopewell, testify about the events of December 22, 1998. *Id.* at 111-15.

Thornton identified Snead in a photographic array and both Thornton and Smith identified Snead as the shooter in court. ECF 9-4 at 123 (in-court identification by Thornton); 145-46 (photo array identification by Thornton).  The photo array identification process was conducted by

---

[2]     Pagination cites to the record correspond to the page numbers assigned by the Court's electronic docketing system and may differ from the original page numbers assigned by its proponent.

Detective Ray Hunter. ECF 9-2 at 29-57 (preliminary hearing, motion to suppress). Thornton described the shooter as a "black male, about five seven, a hundred sixty pounds" with "dredded like hair" wearing a "green army jacket" and "tan boots and regular jeans." *Id.* at 34. Hunter testified that it took "a couple seconds" for Thornton to identify Snead as the shooter. *Id.* at 47; 52.

Smith testified that at the time of the shooting, three men approached the area joking around. ECF 9-4 at 233. He heard one of the men make a bet of ten dollars that "you won't do him" just before two of the men left the area. *Id.* at 234. Snead remained in the area, pulled a bandana over his face and began "creeping up." *Id.* at 235. Smith recalled seeing the handle of a gun protruding from the waistband of Snead's pants and nudged Thornton in an effort to get him to flee the area. *Id.* at 235. As Smith fled, he heard gunshots, and saw Thornton run past him. *Id.* 235-36. Smith sustained a gunshot wound to his left foot. ECF 9-4 at 228.[3] Smith explained he did not cooperate with police in the beginning of their investigation because he feared retaliation and had just gotten back home from prison. ECF 9-5 at 36-37.

Thornton testified that Snead was someone he had seen in the area before and on the morning of the shooting, Snead was with two other men causing a disturbance. ECF 9-4 at 126; 134. Thornton recalled hearing a pop and seeing Smith run past him. *Id.* at 128. When Thornton looked at Snead, Snead pulled a bandana on his face, pointed the gun, and shot Thornton. ECF 9-4 at 133-4; 195. After he was shot three times, Thornton ran down Milton to Fairmount and collapsed. *Id.* at 136.

After he was released from the hospital, Thornton spoke to his cousin who told him that two men were involved in the shooting and that one of the men was named Maynard. ECF 9-4 at

---

[3]     In the Court's electronic copy of the transcript page number 231 appears at ECF page number 229. The cite to page 228 indicates the transcript page number, not the ECF page number.

142. Thornton related this information to the police. *Id.* at 143. Additionally, Thornton stated that he saw Snead on Fayette Street about six months after the incident and asked him why it had happened. *Id.* at 150-51. He recalled that Snead replied, "It wasn't meant for you." *Id.* at 151-52.

During the police investigation of the incident, Snead's home, which he shared with his mother, sister, and "numerous friends" was searched. ECF 9-1 at 105. The police located a box of ammunition and four documents with Snead's name on them near a "cubby hole shelf" in the basement. ECF 9-5 at 50-51. They also recovered a handgun between a mattress and bedspring as well as a box of ammunition. *Id.* at 53-55. Snead was subjected to a frisk search and "a mask" was retrieved from his pocket. *Id.* at 47-48.

Forensic evidence was introduced establishing that the cartridge cases found at the scene matched the gun found in Snead's bedroom. ECF 9-5 at 113. During a search of the home of Ricky Evans, police uncovered five bullet casings in the backyard that also matched the gun. *Id.* at 64-65.

Snead's mother, Sheila Gilliam, and sister, Sharee Gilliam, testified on his behalf and explained that many people slept in various beds throughout their home. ECF 9-5 at 209-11; 225-26. They maintained that the bed where the gun was found had been used by Ricky Evans who they described as a frequent visitor at their house. *Id.* at 215; 226. The State introduced evidence that established that none of the documents found in the Snead home had Evans's name on them and that Evans's photograph had been in the array shown to the victims. ECF 9-5 at 152; 220.

On May 24, 2000, the jury returned guilty verdicts on three counts each of reckless endangerment, use of a handgun in the commission of a crime of violence, and wear, carry, transport a handgun on the person; and one count each of assault in the first degree and of felon in

possession of a firearm.[4]  ECF 9-6 at 114-19.  The following day, Snead was sentenced to 35 years in prison.   ECF 9-7 at 16-20.   On June 29, 2000, Snead filed a motion for sentencing reconsideration pursuant to Md. Rule 4-345(e).  The motion was denied on July 6, 2007.  ECF 9-1 at 17-18.

## II.    Direct Appeal

In his direct appeal, Snead alleged three grounds of trial court error, one of which raised the trial court's acceptance of inconsistent verdicts with respect to the charges of using a handgun in the commission of a felony or crime of violence.  ECF 9-1 at 37.  In the context of the direct appeal, Snead's counsel filed a motion to correct the record after she confirmed, through review of an audiovisual recording of the proceeding, that the sentencing transcript contained an error. ECF 9-1 at 64, n.4.  The correction was certified as accurate by the court reporter and the motion was granted.  *Id.* at 214-15.

In an unreported opinion issued May 7, 2001, the Court of Special Appeals affirmed Snead's conviction.  ECF 9-1 at 102-12.  The court's mandate issued on June 8, 2001.  *Id.* at 113. Snead's self-represented petition seeking certiorari review with the Maryland Court of Appeals was denied on September 14, 2001.  *Id.* at 116.

## III.   Discovery of Lotus Notes Evidence

On September 7, 2004, Snead received discovery in an unrelated murder case that included police reports of the investigation in this case.  ECF 9-1 at 40.  The reports, which were written by Detective Ray Hunter, were entitled "CIB—VC SHOOTING DATABASE . . . Progress Report." ECF 6-1 at 2-8.  Of particular import to Snead's claim that this information was exculpatory and

---

[4]      The transcript of the jury's verdict incorrectly notes that Snead was found not guilty of first-degree assault on Timothy Thornton. ECF 9-6 at 116. Later when the verdicts were read back to the jury by the Clerk, the verdict on that count was correctly read as "guilty." *Id.* at 119.

he had not received it during pre-trial discovery are the notes written in February 1999 documenting a report by Timothy Thornton that he saw the individual who shot him and that he "hangs at the corner of Collington and Jefferson streets." *Id.* at 2. According to the note, Thornton also told Hunter that he knew the house where Leroy Milton lives, but not the address. *Id.* Milton was present at the bus stop on the day Thornton was shot.

A note date February 23, 1999, indicates that Detectives Hunter and Weaver, along with Sgt. Moreland, went to "the area of Collington and Jefferson streets." ECF 6-1 at 3. Once there, Hunter indicates the stopped and interviewed two potential suspects: "James Nathaniel Johnson b/m 11-21-76 of 418 N. Chester St. Same has 6 gold teeth [on] the top and 4 on the bottom. . . . Wendell Johnson b/m 1-28-78 of 4177 Patterson Park. 5'6" 172 lbs, 3 gold teeth (one w/ tear drop)." *Id.*

In a note dated February 25, 1999, Hunter wrote:

> this detective spoke with the victim Timothy Thorton [sic]. Same advised this detective that he saw the person who shot him at the corner of Collington and Jefferson Street wearing a black sweat suit. Same also provided this detective with the street name O.G. for the suspect. Same also advised this detective that his niece is working on getting the real name of the suspect. Same also advised this detective that he spoke with another victim in this case Donnell Smith. Same advised this detective that he would come in for another interview.

ECF 6-1 at 4.

The note dated February 27, 1999 reads:

> this detective spoke with Timothy Thorton [sic]. Same stated that he spoke with Leroy Milton and same stated that the individual that shot him was arrested at [sic] bar located at E. Northern Parkway and Loch Raven called Uncle Harry's. On 26 Feb 99 between the possible hrs. of 2300 and 2400

ECF 6-1 at 5.

The final note is dated March 1, 1999 and states:

On 1 Mar 99 this detective looked through the C.A.D. system to find out if anyone had been arrested at Uncle Harry's bar on 26-27 Feb 99. Same showed that a call for a disorderly came out at that location on 27 Feb 99 @ 0100 hrs. but, no-one was arrested. This detective will investigate same by talking to the officer that handled the incident.

ECF 6-1 at 6.

## IV.   Post-Conviction Proceedings

On April 9, 2009, Snead filed a petition for post-conviction relief, which was supplemented on October 28, 2009. ECF 9-1 at 117-38. Relevant to the matters pending before this Court, Snead alleged that (1) trial counsel rendered ineffective assistance of counsel; (2) the State violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963) when it failed to disclose the Lotus Notes regarding Milton's statement to Thornton in February 1999 that Thornton's assailant had been arrested at Uncle Harry's Bar proving, in Snead's view, that Thornton and Hunter committed perjury when they testified that Thornton never offered more identifying details after he was shot; (3) the trial court erred in various ways; and (4) the trial court imposed an illegal sentence on the first-degree assault count as to Thornton because in the original trial transcript the jury acquitted Snead on that count. *Id.*

At the post-conviction hearing held on April 28, 2010, Assistant State's Attorney Michelle Martin testified that she prosecuted Snead and Ricky Evans in 2004 in an unrelated murder case and learned that the gun Snead allegedly used in that homicide case was also involved in a number of other shootings, including the one involving Thornton, Smith, and Davis that occurred on December 22, 1998. ECF 9-8 at 13-26. In the context of the homicide case, Martin testified that she provided information regarding the shooting of Thornton, Smith, and Davis because she wanted to use them as other crimes evidence. *Id.* at 15. Martin also testified that she disclosed the Lotus Notes to the defense in the context of her homicide trial. *Id.* at 22; 25-26. Martin stated that

7

the Lotus Notes she turned over in her homicide case came from the State's Attorney's file regarding the shooting on Fayette Street. *Id.* at 26.

Snead's trial counsel, Robin Zoll, also testified at the post-conviction hearing. ECF 9-8 at 52-67. She recalled that the discovery process in Snead's criminal case "was like pulling teeth to get anything" and that after she hounded the State's Attorney, he met with her in a basement conference room where he provided her "a bunch of documents." *Id.* at 56. She recalled being there for about an hour but could not remember what was copied or what she took away from that meeting. *Id.* Ms. Zoll did, however, state that she had never seen the Lotus Notes prior to the post-conviction hearing. *Id.* at 56-7. She further characterized the Lotus Notes as exculpatory because Snead was in jail at the time Thornton reported to Hunter that the person who had shot him had been arrested at Uncle Harry's bar on February 26. *Id.* at 57-58. In Ms. Zoll's view, the Lotus Notes were also evidence that Thornton did not know who shot him. *Id.*

Snead testified at the post-conviction hearing and maintained that the first time he had seen the Lotus Notes was when "Mr. Romel Showell brought me the supplement petition." ECF 9-8 at 71. Showell represented Snead in the unrelated murder trial. *Id.* at 72.

State's Attorney James Green testified at the post-conviction hearing for the State. ECF 9-8 at 85-116. He recalled that he met with Ms. Zoll on a number of occasions and that all of the evidence related to Snead's case "was pulled from evidence control" and they went over it together. *Id.* at 87. He further maintained that she was allowed to view everything in his file, with the exception of his personal notes, as that was his practice and that disclosure included the Lotus Notes. *Id.* at 88-89. Under cross examination Mr. Green admitted that while he had a firm memory of showing Ms. Zoll his entire file, he did not have a specific memory of everything contained in the file as it was a large file. *Id.* at 109; 111-12.

8

Relevant to the matters at issue here, the post-conviction court found that Snead's *Brady* claim failed to meet any of the three elements required for such a claim. *See* ECF 9-1 at 155 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (a violation of *Brady* requires a showing that (1) the evidence was suppressed by the government; (2) the evidence was favorable to the defense; and (3) prejudice ensued)). With regard to concealment of the evidence, the post-conviction court first observed that "[u]nder *Brady* and its progeny, the defense is not relieved of its obligation to investigate the case and prepare for trial." ECF 9-1 at 156 (citing *Adams v. State*, 165 Md. App. 352 (2005)). Further, "[i]f a defendant has actual or constructive knowledge of the allegedly withheld exculpatory information, there cannot be a *Brady* violation." *Id.* (citing *Ware v. State*, 348 Md. 19, 39 (1997)). Here, testimony at the post-conviction hearing established that the Lotus Notes evidence did not simply surface in a later case as Snead would have it. Rather, the State's Attorney from the later case testified that the Lotus Notes were pulled from the file concerning this conviction. ECF 9-1 at 157. Further, defense counsel and the State's Attorney recalled a discovery hearing held before Judge Prevas that was the impetus for an "open file disclosure that contained the Lotus Notes in dispute." *Id.* The post-conviction court found that "[t]he record as a whole indicates that [Snead's] trial counsel at least possessed constructive knowledge of the Lotus Notes, and therefore there was no suppression by the State and no *Brady* violation." *Id.*

The post-conviction court also found that the evidence was not exculpatory. Although Snead asserted, as he does here, that he was incarcerated at the time an alleged person identified as the shooter was arrested at Uncle Harry's Bar, the same Lotus notes also reflect that an investigation into the allegation revealed that nobody was arrested when the incident at the bar occurred. ECF 9-1 at 158. Further, Snead did not offer any proof of his incarceration during the time when the alleged shooter was arrested at the bar. *Id.*

The post-conviction court also did not view the evidence as a means by which to impeach

Timothy Thornton and Detective Hunter. ECF 9-1 at 158-59. Specifically, the post-conviction

court observed:

> [Snead] . . . argues that the witnesses denied the existence of the evidence in the
> Lotus Notes, but the record does not support his contention. Specifically, Det.
> Hunter testified as follows:
>
> Q: . . . He didn't ever call you to say, hey, I spotted the guy who shot me, did
> he?
> A: No, m'am.
> Q: And he never called to give you any more information about the way that
> person looked, did he?
> A: The way he looked, no, ma'm.
>
> The Lotus Notes do not contradict the above testimony because the Lotus Notes
> refer to information Thornton received from Leroy Milton, not information
> about what the shooter looked like nor information that Thornton directly saw
> the person who shot him. The testimony by Thornton also does not contradict
> the Lotus Notes, and similarly involves questions about Thornton's
> identification and physical description of the assailant.

ECF 9-1 at 159 (record citation omitted).

Finally, the post-conviction court also found that there was no prejudicial effect resulting

from the absence of the Lotus Notes from trial. *Id.* at 159-60. The court first observed that there

is no duty on the State to disclose evidence that is not material or of no probative value. *Id.* at 159.

"Evidence is material under *Brady* when 'favorable evidence could reasonably be taken to put the

whole case in such a different light as to undermine to confidence in the verdict.'" *Id.* at 159-60,

quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). In reaching its conclusion that Snead's trial

was fair, even if the Lotus Notes had not been disclosed, the post-conviction court reasoned that:

> In sum, it is unlikely that the disclosure of the Lotus Notes would have rendered
> a reasonable probability of a different result. Petitioner's counsel possessed at
> least constructive knowledge of the documents. Even with the documents,
> however, it is unlikely that the Lotus Notes would reasonably have led to a
> different result because they do not tend to clear Petitioner of guilt and are
> ineffective for the purpose of impeaching witnesses. Finally, due to the

10

determination that disclosure would not have led to a different result under *Brady*, the Court additionally concludes that Petitioner's allegation of error under *Strickland* fails to prove prejudice based on Petitioner's trial counsel's alleged failure to diligently investigate the Lotus Notes.

ECF 9-1 at 160.

Snead's application for leave to appeal the denial of post-conviction relief was denied on February 26, 2013. ECF 9-1 at 180-81.

## V.    Motion to Correct Illegal Sentence

On June 29, 2012, Snead filed a motion to correct illegal sentence pursuant to Md. Rule 4-345(a). ECF 9-1 at 20 (docket entry). In his motion, Snead alleged that the trial court unlawfully imposed a sentence for first-degree assault on Timothy Thornton because the jury acquitted him on that charge. The motion was denied, and Snead appealed the denial to the Maryland Court of Special Appeals. The appellate court issued an unpublished opinion on January 5, 2015, rejecting Snead's claim as factually inaccurate. ECF 9-1 at 213-18. The court first acknowledged that the trial transcript indicated that the jury had returned a verdict of not guilty on the first-degree assault, but also observed that the jury's verdict sheet and the docket sheet indicate Snead was found guilty of this offense. *Id.* at 214. The court also noted that while Snead's direct appeal was pending his appellate counsel filed a motion to correct the record that included a corrected version of the transcript with certification from a court reporter of its accuracy so that a claim of inconsistent verdicts could be raised. *Id.* at 214-15. The motion to correct the record was granted. *Id.* at 215. The court further observed:

> [Snead's] argument focuses on the way that this Court handled his motion to correct the record during the course of his 2000 direct appeal. He points out that the transcript, as originally certified by the court reporter, indicated that he had been found not guilty of assault and asserts that we erred in (1) relying upon his appellate counsel's representation that, upon her review of the video recording of the proceedings, she concluded that the jury had returned a guilty verdict on

11

the assault charge; and (2) failing to hold an adversarial, evidentiary hearing. He
argues that we deprived him of due process in so doing. We do not agree.

ECF 9-1 at 216-17. The court then observed that the motion to correct the record was Snead's
motion and the failure to provide him with a hearing before granting the relief he sought did not
prejudice him. *Id.* at 217. Further, the unsuccessful inconsistent verdict argument did not bestow
upon Snead the right to now take an "inconsistent position and to ask us to vacate his conviction
on the basis that this Court erred in granting his motion in 2000." *Id.*

The appellate court also rejected Snead's argument that had he asked for a guilty verdict to
be changed to a not guilty verdict, the Court of Special Appeals would not have accommodated
the request. *Id.* at 217. The court explained that "[e]rrors in trial court records, including
transcripts, do occur and this Court grants meritorious motions to correct errors." *Id.* Because the
motion filed by Snead's appellate counsel was unopposed by the State, and the correction was
consistent with the docket entries and verdict sheet. *Id.* at 217-18.

## VI.    Petition for Writ of Actual Innocence

On April 1, 2014, Snead filed a petition for writ of actual innocence. A hearing on the
petition was held on June 24, 2016 in the Circuit Court for Baltimore City. ECF 9-1 at 268-77,
*see also* ECF 9-9 (transcript of hearing). In his petition Snead alleged that "four 'CIB-VC Shooting
Database' reports referencing interviews related to Petitioner's case on February 22, 1999,
February 25, 1999, February 27, 1999, and March 1, 1999 are newly discovered evidence." ECF
9-1 at 268. In its written ruling and order dated August 8, 2016, denying the petition the Circuit
Court found that Snead had failed to meet his burden to "show there is newly discovered evidence
that 'could not have been discovered in time to move for a new trial under Maryland Rule 4-331.'".
ECF 9-1 at 274-75, quoting Md. Code Ann., Crim. Proc. § 8-301(a)(2). Having failed to meet that
burden, the court did not reach the issue of whether the second prong – whether the "newly

discovered evidence 'creates a substantial or significant possibility that the result may have been

different'" – had been satisfied. *Id.* at 275, quoting Md. Code Ann., Crim. Proc. § 8-301(a)(1).

The law applied by the Circuit Court to reach its conclusion that the evidence was not

newly discovered was set out by the court as follows:

> The discussion of "newly discovered" evidence has two parts. First, the court
> asks about timing, "*i.e.*, when was the evidence discovered? . . .when could or
> should it have been discovered?" *Argyrou v. State*, 349 Md. 587, 602 (1998).
> Second, the court asks if the evidence "could not have been discovered by due
> diligence." *Jackson v. State*, 216 Md. App. 347, 364 (2014). Due diligence is
> acting "reasonable and in good faith . . . in light of the totality of the
> circumstances and the facts." *Argyrou*, 349 Md. At 604-05. "The diligence
> criterion is a demanding one, and it may not be casually brushed aside." *Yonga
> v. State*, 221 Md. App. 45, 99 (2015) *aff'd* 446 Md. 183 (2016). Unless the
> evidence is newly discovered, no relief is available, "no matter how compelling
> the cry of outraged justice may be." *Love v. State*, 95 Md. App. 420, 432 (1993).

ECF 9-1 at 269.  In reaching its conclusion that the evidence at issue was not newly discovered as

defined by applicable law, the court did not find Snead's trial counsel credible in her testimony at

the hearing on the petition. Rather, the court observed that:

> Ms. [Zoll] testified that she first saw these reports at [Snead's] post conviction
> hearing on April 28, 2010. However, she acknowledged that she could not
> remember exactly which of the reports were shown to her six years ago. Further,
> and most importantly, her testimony about what she received over *sixteen* years
> ago in pretrial discovery was completely lacking. When asked about discovery,
> she testified that she recalled her with a large stack of
> documents which she "flipped through" during a meeting with the State. She
> could not say whether the reports in question were in the stack. She claimed that
> she was somehow hurried by the State during her review and therefore was
> prevented from thoroughly reviewing the discovery. Nonetheless, she never
> asked either for additional time to review the documents, or for court assistance
> to address any allegedly deficient discovery. Regardless, "[e]ven a good
> explanation for not having exercised due diligence is not the same thing as the
> actual exercise of that due diligence." *Love*, 95 Md. App. at 436. Neither party
> could present any record of what was actually sent or received in discovery over
> sixteen years ago and the Court finds that [Snead's] trial counsel simply had no
> idea what was sent or received in discovery. Consequently, based on the
> evidence and testimony presented at the hearing, the Court finds that the Petition
> has failed to show either that the reports were not produced in pretrial discovery

13

or that with due diligence, counsel could not have discovered the reports. The Petition, therefore, is denied.

ECF 9-1 at 276.

Snead appealed the denial. *Id.* at 278-317 (Appellant's Brief). In an unreported opinion dated September 25, 2017, the Court of Special Appeals affirmed the Circuit Court's denial of relief. *Id.* at 366-98. The Court of Special Appeals observed, in pertinent part, that "[t]his file was reviewed more than 17 years ago, it no longer exists, and no one has any specific recollection of what, precisely, was in the file." *Id.* at 395. Snead sought certiorari review in the Court of Appeals. *Id.* at 394-420. On January 19, 2018, the Court of Appeals denied the petition. *Id.* at 435.

## Discussion

Snead's petition was received in this Court on April 22, 2019. ECF 1. Snead acknowledges his petition is untimely and seeks equitable tolling of the one-year deadline and also invokes actual innocence as a gateway claim to overcome the failure to comply with the filing deadline. *Id.* at 5. Snead raises a claim that trial counsel rendered ineffective assistance when she failed to discover the Lotus Notes evidence (ECF 1 at 2; ECF 6 at 4-5); the State violated *Brady* when it failed to provide the Lotus Notes in pre-trial discovery (ECF 1 at 2-3; ECF 6 at 5); and he was illegally sentenced for a first-degree assault for which he was acquitted (ECF 1 at 4-5; ECF 6 at 6). Before this Court may reach the merits of his claims, the untimeliness of the petition must be excused.

A one-year statute of limitations applies to habeas petitions in non-capital cases for a person convicted in a state court. *See* 28 U.S.C. ' 2244(d). This section provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

14

(B) the date on which the impediment to filing an application created by State action in violation of the constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Respondents assert that the latest of these statutory tolling provisions that might apply to Snead's petition, affording it liberal construction, is "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)((1)(D). Even with such liberal allowance, however, Snead's petition would still be untimely. Assuming Snead, through the exercise of due diligence, could not have discovered the Lotus Notes evidence until the date on which he actually received the documents, the date he actually received them was September 7, 2004. ECF 9-1 at 40 (State's Supplemental Disclosure). Using September 7, 2004 as the operative date, the federal habeas deadline would have expired one year later on September 7, 2005. *See* 28 U.S.C. § 2244(d)(1). The instant petition was not filed until April 16, 2019, almost 14 years later. Thus, if Snead is not entitled to equitable tolling of the limitations period or he fails to present a viable actual innocence claim as a gateway to consider the substance of his petition, the petition must be dismissed as untimely.

### Equitable Tolling

"[T]he one year limitation period is also subject to equitable tolling in 'those rare instances where B due to circumstances external to the party's own conduct B it would be unconscionable to enforce the limitation against the party and gross injustice would result.'" *Hill v. Braxton*, 277 F.3d 701, 704 (4th Cir. 2002) (citing *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)). To be entitled to equitable tolling, a federal habeas petitioner must establish that either some wrongful conduct by Respondents contributed to his delay in filing his petition or that circumstances that were beyond his control caused the delay. *See Harris*, 209 F. 3d at 330. A federal habeas petition does not toll the one-year limitation period. *See Duncan v. Walker*, 533 U.S. 167, 175 (2001) (a federal habeas petition is not an application for State post-conviction or other collateral review within the meaning of § 2244(d)(2) and therefore does not toll the limitation period while it is pending).

Snead is blind[5] and states that "[i]t is my blindness that has prevented me from filing for Federal Habeas Corpus in a timely fashion, and my blindness is the reason why to date I haven't been able to prove my innocence in a case of law at any level." ECF 1 at 1. He explains that he was diagnosed with Rheumatoid Arthritis in 2001 and the following year began losing his sight. *Id*. at 2. He adds that "most, if not all, other filings and motions" filed in the Maryland State courts were filed "pro se, by a blind man trying to present his case to a court system designed to be punitively ruled and with timelines impossible to meet unless you are a sighted individual or an attorney." ECF 6 at 2. During his testimony at the hearing held on his petition for writ of actual innocence, Snead explained that he first lost the sight in his right eye in 2002 and his "left eye had

---

[5]   *See* ECF 9-9 at 40-42 (Snead's testimony at writ of actual innocence hearing indicating his vision difficulties started in 2002 and he was completely blind by 2013). Snead does not, as Respondent points out, provide certified medical records that attest to the current state of his vision, but this Court will assume he testified truthfully in the Circuit Court for Baltimore City.

inflammation." ECF 9-9 at 41. Snead also testified that he became "completely blind" in 2013. *Id.* at 42. After losing his sight Snead relied on the assistance of other inmates to read and write things for him. *Id.* at 43-44.

On September 7, 2005, a liberal allowance for the federal habeas deadline, Snead still possessed some of his vision. The period of time between the deadline and the year he became completely blind is approximately 8 years. There is another 6-year period that elapsed before he filed his petition in this Court. Even if Snead's visual impairment presented a viable basis for equitable tolling at some point during the intervening time frame, there is nothing in the record before this Court to support a finding that his visual impairment excuses the lengthy delay between the date he came into possession of the Lotus Notes evidence and the date he filed the instant petition. Further, Snead himself does not actually assert that his 2002 retinal detachment prevented him from filing a federal habeas petition but that it prevented him from "being able to truly consider the relevance of" the Lotus Notes evidence. ECF 1 at 3. By April 14, 2009, the date on which Snead filed a pro se post-conviction petition, he had gained an appreciation of the alleged significance of the documents. His lack of familiarity with the law, however, is not a basis for equitable tolling of the filing deadline. *See United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004). Accordingly, this Court finds that Snead is not entitled to an equitable tolling of the filing period.

### Actual Innocence

Actual innocence is an "equitable *exception* to § 2244(d)(1), not an extension of the time statutorily prescribed." *McQuiggin v. Perkins*, 569 U.S. 383, 391 (2013) (emphasis in original). "[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief." *Id.* at 392. Thus, Snead's

claims, concededly time-barred, may be reached if "new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *Id.* at 395 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). In the context of an untimely petition, "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *Perkins*, 569 at 399. "It would be bizarre to hold that a habeas petitioner who asserts a convincing claim of actual innocence may overcome the statutory time bar § 2244(d)(1)(D) erects, yet simultaneously encounter a court-fashioned diligence barrier to pursuit of [his] petition." *Id.* "This rule, or fundamental miscarriage of justice exception, is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Id.* at 392.

Examples of the type of new evidence that have been found to satisfy the actual innocence gateway standard are: (1) new DNA evidence and expert testimony "call[ing] into question" the "central forensic proof connecting [the petitioner] to the crime," as well as "substantial evidence pointing to a different suspect," *House*, 547 U.S. at 540-41 (2006); (2) "sworn statements of several eyewitnesses that [the petitioner inmate] was not involved in the crime" and affidavits "that cast doubt on whether [the petitioner inmate] could have participated" in the offense, *Schlup*, 513 U.S. at 331; (3) a third party's consistent and repeated statement that the third party committed the offense, *Jones v. McKee*, No. 08 CV 4429, 2010 WL 3522947, at *9-10 (N.D. Ill. Sept. 2, 2010); *Carringer v. Stewart*, 132 F.3d 463, 478-79 (9th Cir. 1997) (finding that the petitioner opened the actual innocence gateway where another person testified under oath that he committed the offense and separately boasted to other individuals that he set-up the petitioner); and (4) documentary evidence indicating that the petitioner was in another country on the day of the offense and five affidavits from individuals stating that the petitioner was outside the country at the precise time of

the offense, *see Garcia v. Portuondo*, 334 F. Supp. 2d 446, 452-56 (S.D.N.Y. 2004). *See generally Schlup*, 513 U.S. at 324 (providing the Supreme Court's statement that examples of sufficient new reliable evidence for a gateway claim including "exculpatory evidence, trustworthy eyewitness accounts, or critical physical evidence").

Whether a petitioner has satisfied the miscarriage of justice exception it requires the reviewing court to consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). The new evidence must be evaluated with any other admissible evidence of guilt. *Wilson v. Greene*, 155 F.3d 396, 404-05 (4th Cir. 1998). "'To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial." *Schlup*, 513 U.S. at 324. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Id.* at 315–17.

The Supreme Court "caution[ed], however, that tenable actual-innocence gateway claims are rare: 'A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror acting reasonably would have voted to find him guilty beyond a reasonable doubt.'" *Perkins*, 569 U.S. at 386 (brackets omitted) (quoting *Schlup*, 513 U.S. at 329; *House*, 547 U.S. at 538; *Wilson*, 155 F.3d at 404 ("Claims of actual innocence . . . should not be granted casually.") (internal citations omitted). To sustain a credible claim of actual innocence a Petitioner must marshal "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S at 324. "Because such evidence is obviously unavailable in the vast

majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324. The gateway actual innocence "standard is demanding and permits review only in the extraordinary case." *House*, 547 U.S. at 538 (citation omitted); *see, e.g., Perkins*, 569 U.S. at 401 ("We stress once again that the [actual innocence] standard is demanding."); *Wilson*, 155 F.3d at 404 ("Claims of actual innocence . . . presented . . . as gateways to excuse a procedural default . . . should not be granted casually.").

"At the same time, though, the [actual innocence] standard does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538. "Rather, the petitioner must demonstrate that more likely than not, in light of new and reliable evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Teleguz v. Zook*, 806 F.3d 803, 809 (4th Cir. 2015) (citing *House*, 547 U.S. at 538). The actual innocence determination "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." *Bell*, 547 U.S. at 539 (internal citations and quotations omitted); *Finch v. McKoy*, 914 F3d 292 (4th Cir. 2019).

In reviewing the record, the Court must "make a probabilistic determination about what reasonable, properly instructed jurors would do. The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538 (internal citations and quotations omitted). The petitioner must "demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice. Only if a petitioner passes through the actual innocence gateway by satisfying this standard, can this Court consider and reach the merits of his claims. *Teleguz*, 689 F.3d at 329 (internal citations omitted).

In support of his actual innocence claim Snead relies on the Lotus Notes he maintains were withheld from trial counsel in violation of *Brady*. In considering this claim this Court finds itself in agreement with the post-conviction court's analysis of Snead's *Brady* claim. The evidence on which he relies was not improperly withheld from counsel, it neither exonerates Snead nor impeaches an important State witness, and its existence does not make it likely the trial result would have been different had the evidence been used at trial. *See* ECF 9-1 at 162-66. Throughout the proceedings held to consider Snead's claims, there was no reliable evidence introduced tending to show that the Lotus Notes were withheld from Snead's trial counsel. At best, trial counsel could not recall whether the documents were included in what was described as a voluminous file approximately 12 inches thick. Rather, trial counsel simply related that she thought she may have spent an hour reviewing the file and felt she was rushed out by the State's Attorney. In stark contrast to that recollection, trial counsel did not return to the trial court to complain about the State's alleged failure to comply with the discovery meeting ordered by Judge Prevas.[6]

Snead also appears to pin some of his claim that he is actually innocent on the typographical error that appears in the trial transcript. He acknowledges that a correction was sought and granted in the context of his direct appeal but posits the question of why the corrected transcript was not made a part of the record before the post-conviction court. The failure to replace the record with the corrected version of the transcript is not evidence that the jury found Snead not guilty on the first-degree assault charge in connection with Timothy Thornton. Indeed, the uncorrected transcript contains a clue that the transcription of the verdict was incorrect. As the jury was

---

[6] Snead appears to misconstrue the finding by the Actual Innocence court when it did not find trial counsel's memory reliable after sixteen years had passed. He suggests that since the post-conviction court found that trial counsel did not render ineffective assistance of counsel, the actual innocence court was bound by that conclusion. The court considering his petition for writ of actual innocence did not, however, find that trial counsel was ineffective. Rather, the lack of credibility in her testimony was connected to the passage of time and the destruction of files and records relevant to the criminal trial, *i.e.*, none of the parties could produce the discovery documents provided by the State during the trial because it had been destroyed.

responding to the Clerk's questions on the first-degree assault charge in question, the Clerk then asked how the jury found on the lesser-included offense of second-degree assault in connection with Timothy Thornton. ECF 9-6 at 116. The trial court then interjected "skip." *Id.* at 117. Had Snead been found not guilty on the first-degree assault there would have been no need to skip a verdict reached on second-degree assault. Further, when the Clerk read the verdicts back to the jury during the harkening the verdict for first-degree assault on Timothy Thornton was noted as "guilty" and the jury affirmed that was their verdict. *Id.* at 119. The claim that the transcription error lends itself in any way to a claim of actual innocence is without merit.

**Conclusion**

Because the Court concludes that Snead's petition is untimely and does not merit an equitable tolling of the filing period, nor does Snead satisfy the actual innocence gateway requirement, the merits of the claims raised shall not be reached and the petition shall be dismissed as untimely. When a district court dismisses a habeas petition solely on procedural grounds, a certificate of appealability will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Rose v. Lee,* 252 F.3d 676, 684 (4th Cir. 2001) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). Snead may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee,* 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one). A separate Order follows.

*February 4, 2021*
Date

*RICHARD D. BENNETT*
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE